Anthony F. Parthun, Appellee, v. Elgin, Joliet and Eastern Railway Company, Appellant.

Gen. No. 43,038.

410

Heard in the third division of this court for the first district at the April term, 1944.

Opinion filed March 21, 1945. Released for publication April 10, 1945.

KNAPP, CUSHING, HERSHBERGER & STEVENSON, of Chicago, for appellant; HARLAN L. HACKBERT, of Chicago, of counsel.

WILLIAM WALLACE McCALLUM and MARION J. HANNIGAN, both of Chicago, for appellee.

MR. JUSTICE KILEY delivered the opinion of the court.

This is an action under the Federal Employers' Liability Act (45 U. S. C., Chap. 2) with verdict and judgment for plaintiff in the amount of $40,000. Defendant has appealed.

Plaintiff, employed by defendant as a locomotive fireman, was injured July 28, 1943, when he fell from the tender of a locomotive as he was pushing a waterspout into position after filling the water tank. The

case went to the jury on Count 2, which alleged defendant's negligent violation of the Boiler Inspection Act (45 U. S. C., Chap. 1, Sec. 23), under which there is no question of contributory negligence. (45 U. S. C., Chap. 2, Sec. 53; *Lilly v. Grand Trunk*, 317 U. S. 481.) In addition to the general verdict of guilty, the jury found in pertinent special interrogatories that the board attached to the grab iron on the top of the tender gave way so as to cause plaintiff to be thrown from the top, and that coal was lying on the top of the tender at and immediately prior to the accident. Defendant moved to set aside the general and those special verdicts, to vacate the judgment and enter judgment for defendant notwithstanding the verdicts and for a new trial. The several motions were denied.

■ ■ Defendant contends here that the verdict is excessive, and against the manifest weight of the evidence. Plaintiff claims that this court is bound by the decisions of the Federal Courts in cases of this kind and has no authority to weigh the evidence. Under section 56 of the F. E. L. Act, plaintiff had the right to sue in a Federal District Court or in a State Court. *Miles v. Ill. Cen. R. R. Co.*, 315 U. S. 698. Having chosen courts of this State, he must prosecute his action in accordance with our modes of procedure (*Minn. & St. Louis R. R. Co. v. Bombolis*, 241 U. S. 211), and we have authority to weigh the evidence to determine whether the verdict should stand or whether it should be set aside and the cause retried. (Chap. 110, Par. 216, Sub-par. (3) b, Ill. Rev. Stats. [Jones Ill. Stats. Ann. 104.092, subpar. (3) b]; *Corcoran v. City of Chicago*, 373 Ill. 567; and *Mitchell v. L. & N. R. R. Co.*, 375 Ill. 545.) In *Tennant v. Peoria & Pekin Union Railway Co.*, 321 U. S. 29, relied upon by plaintiff, suit was filed in a Federal District Court and the case is, therefore, not applicable.

The engine and tender had been stopped, facing east, on the track next north of, and opposite to, the water pipe. The coal bin serving the locomotive is located

in the front part of the tender, and its sides and rear rise 3 or 4 feet above the surface of the water tank comprising the balance of the tender. Plaintiff, after turning the water pipe and spout north into position to fill the tank, climbed by steps on the sloping surface to the level top surface of the tender, in the center of which is the raised mouth of the water tank. Along each side of the coal bin is a runway, and about 6 inches above each side of the bin is a grab bar of iron pipe which extends the length of the coal bin, about 5 or 6 feet, held to its side by 4 upright brackets. To increase the capacity of the coal bin, the spaces between the grab bar and tops of the sides of the coal bin were partially filled by wooden planks fastened by wire. Plaintiff, after filling the tank, started walking east on the right runway toward the locomotive, pushing the spout ahead of him, toward its normal position facing east and holding the grab bar with his left hand. There is no dispute that, while so engaged, he fell from the tender and was injured. The question is whether he fell as a result of an unsafe condition of the top of the tender, or only as a result of losing his balance while pushing the spout. Defendant says that because plaintiff is so directly contradicted by its witnesses and because plaintiff's testimony of the cause of his fall on cross-examination is so inconsistent with and contradictory to his testimony on direct examination, and, moreover, because of the physical facts concerning the fall, the verdict is against the manifest weight of the evidence upon the question of causation.

Plaintiff said on direct examination that he fell after he tripped on some coal on the runway, when the wire and board gave way and he lost his grip on the grab bar. On cross-examination he said the spout was harder to turn to the east than west and harder to move that day than previously; that the board which gave way was fastened to the grab iron with loops of

wire which slid back and forth with the board; that the wire and board "let go" and "didn't come off all the way," but " came loose" and the "wire came off" and the "board came loose of the wire" and "slid off that grab iron," and "the wire was looped over the handrail" and the loop "slipped off the grab iron" because "it wasn't a complete loop" but "partly opened" and the wire "partly around the handrail came loose." Defendant's argument of inconsistency and contradiction is not borne out by a reading of the complete record of the testimony on this point. We think the jury was justified in finding that one wire was only partially looped over the handrail, so that it was open at the top, and that the top ends widened and slid off the bar—not off the end of the grab bar which defendant argues was impossible as a physical fact because of the location of the upright brackets, but under the grab bar—as a consequence of which the board became loose. Such an inference was not physically impossible. The engineer contradicted plaintiff's story of the circumstances surrounding his fall, saying that plaintiff did not have a hold of the grab bar when he pushed the spout with his right hand, lost his balance and fell; and he and another witness testified they examined the board and wires after plaintiff fell and found their positions normal, with no evidence that a loop or the board had given way. This contradictory evidence presented a question of credibility for the jury. The jury, furthermore, having made the previous finding, could also find that the action of the wire and board broke plaintiff's grasp on the grab bar. There can be no doubt from the testimony, as well as from the photographs in evidence, that plaintiff's hold on the grab bar could not have been secure because of the presence of the board between it and the top of the side of the coal bin, which made it impossible for him to use his fingers and thumb beneath the grab bar in attaining full grip.

The board nullified the essential purpose of the grab bar. Accordingly, whether he pushed too hard, as the engineer said and as defendant argues, is somewhat difficult to determine if, when he "pushed," he was holding the grab bar. A full grip on the grab bar would have enabled him to push much harder with less danger. The engineer said the board did not prevent a full hold on the grab bar, but it is clear from the photographs that the opposite is true. It is our conclusion that the finding that the board gave way so as to cause plaintiff's fall was justified.

Plaintiff said on direct examination that he tripped on coal on the runway. On cross-examination he said there were three or four shovel fulls of coal on the runway where he was standing; that it had rolled off the overfilled coal bin, but not while he was standing there; that it was there when he got up on top of the tender, though he did not notice it when he was filling the tank, and saw it first when he tripped; that although normally his first function at the start of each day was to "look over" the top of the tender to see whether it was clean, the day of the injury there was no time to do so; that he had looked on both sides of the tender and saw nothing and, so far as he could see, the top of the tender was clear; that at noon when he climbed up to fill the tank the top was clear as far as he noticed; that he looked at the right side and it must have been clean and that the runway was clean at the time he looked. We have examined closely the transcript of testimony on this point and, while some of plaintiff's answers may be confusing, we believe it is plain that he meant that, so far as he saw or noticed, both in the morning and at noon, there was no coal on the runway but that it must have been there, nevertheless, since he tripped on it and saw it as he fell. The engineer and defendant's road foreman of engineers both testified that they examined the top of the tender after plaintiff fell and saw no coal, and the

engineer says that immediately before and at the time plaintiff fell there was no coal on the runway. This defense testimony also presented the question of credibility to the jury.

Defendant says there is no explanation where the coal came from. The engineer says that plaintiff cleaned the runways with a hose in the morning. There is the inference that the coal could not have fallen to the runway during the watering process. Photographs show coal piled in the bin to a point about a foot above the grab bar, and the engineer testified that his engine was bumping freight cars during the morning, and there is testimony that the board which partially filled the space below the grab bar slipped back and forth. These facts and legal inferences show how the coal might have fallen to the runway. Defendant urges a point, bearing on this question, based on argument of plaintiff's attorneys to the jury. The argument is not in the record.

It is argued that, falling face forward as he did, plaintiff could hardly have seen the details of the wire and board giving away, or the coal on the runway. The average juryman's observations of his own or other's falls, would be sufficient basis for belief of enough of the details of plaintiff's story to warrant the jury's verdict. Defendant says plaintiff would not have fallen feet first if he lost his grip or tripped on the coal, and that if he fell head or body first, the spout would have prevented his fall. The "breaking of plaintiff's grip and his tripping" could easily combine so as to cause his feet to slide from under him. There is more room for arguing that, since he fell feet first, as both plaintiff and the engineer say, he probably did not lose his balance, for, in balancing, feet are the fulcrum. If he lost balance it would seem he would have had to jump in order to land as he did, with his body erect and on his feet. Since there was evidence to show that the board and wire gave way and that

there was coal on the runway, the question whether plaintiff fell because of those factors, as he says, or because he, while holding to the grab bar, lost his balance in pushing the spout, as the engineer says, was a question for the jury. The jury found plaintiff's story more reasonable and we cannot say that it should not have done so. *Corcoran v. City of Chicago*, 373 Ill. 567, 579, 580. We believe the facts found by the jury in their answers to the special interrogatories constituted "unnecessary peril to life and limb" and a violation of the Boiler Inspection Act. *Lilly v. Grand Trunk Ry. Co.*, 317 U. S. 481.

At the time of his injury plaintiff was 5 feet 4 inches tall and weighed 210 pounds. When he fell he landed principally on his right foot, felt severe pain and heard the bones break. He was first taken to Carnegie Steel Company's emergency hospital where his right leg and foot were X-rayed and placed in a cast from his knee to his toes. He was then taken to Mercy Hospital in Gary, Indiana, where further X-rays were taken 15 days later, and where he remained until August 21st. A week and a half after he came home he removed the cast himself with a hack saw. No doctor came to see him at home, but a few days after his home-coming the Company ambulance came to take him to see Dr. Donchess at Mercy Hospital, but plaintiff refused to go, saying he did not want to go to the Company doctor. He later told a representative of defendant that the Company doctors were "butchers," and he wanted nothing to do with them. Three weeks after he returned home, plaintiff's leg was examined and X-rayed, and two days later Dr. Turner operated and placed metal pins through the tibia above the ankle and through the heel bone and placed a new cast on his leg. Plaintiff remained in the American Hospital 10 or 11 days before returning home. At home he remained in bed three weeks with severe continuous pain, and again removed the cast himself. He returned

to Dr. Turner the next day, the pins were removed and the leg bandaged and taped. Removal of the pins left open wounds which had not healed at the time of the trial, in December 1943. Up to the time of the trial he was still using crutches, and could not wear a shoe. He was very nervous, had trouble sleeping and was in constant pain, with frequent vomiting and free perspiration.

█ Two medical witnesses testified for each party: for the plaintiff Dr. Turner, who operated on plaintiff's foot, and Dr. Mitchell, who examined him at the time of the trial; for defendant Dr. Donchess, who attended plaintiff at Mercy Hospital, and Dr. Bennett, defendant's chief surgeon. It appears from the testimony of these witnesses that plaintiff's right foot was badly damaged. The injuries included a badly comminuted fracture of the heel bone with spreading and widening of the fragments; fractures of the second, third and fourth metatarsal bones with the ends broken off and displaced to the sides; fracture of the cuboid, the bone next to the rear of the fourth and fifth metatarsal; and impaction of the ankle and heel bones "obliterating" the joint between them. Defendant argues that plaintiff's conduct in removing the casts contributed to the condition of his foot at the time of the trial. Plaintiff did not act prudently in removing the casts from his leg, even though he had been suffering great pain; neither was he prudent in failing to see a doctor during the period between his departure from Mercy Hospital and his first visit to Dr. Turner. There is no denial of the testimony that defendant's representative visited plaintiff after the removal of the first cast and before plaintiff saw Dr. Turner, and that during the visit plaintiff had stood and walked several steps unsupported by crutches; nor that while in Mercy Hospital, over warnings by the doctors, he permitted his right leg to hang downward over the bed and insisted on leaving his bed instead of using a bed pan.

There is, however, testimony of plaintiff's medical witnesses, supported by the X-rays taken just before and after the operation by Dr. Turner, that plaintiff's foot was in substantially the same condition as it was in Mercy Hospital after defendant's doctors had reduced the fractures. Dr. Bennett testified that the X-rays taken after plaintiff left Mercy Hospital showed a progressively abnormal condition. Dr. Turner testified that his operation was not successful because of callus formations, and that he thought it would have been possible to get better alignment of the fractured bones had Dr. Donchess operated immediately after the injury. He disagreed with Dr. Turner that calcium deposits prevented the success of the operation, but granted that scar tissue might have had that effect. This question was for the jury and we would not be warranted in setting aside a finding on the foregoing testimony that plaintiff's imprudence had not substantially affected the condition of his foot.

There can be no doubt from the foregoing that up to the time of the trial plaintiff had suffered great pain. Defendant argues that at the time of the trial plaintiff's foot was still in the process of healing and that, according to Dr. Bennett, plaintiff's pain would be gone within a period of about 8 months. The evidence showed that sharp spurs had resulted from adjustment and maladjustment of fragments and fractures, and X-rays taken at the time of the trial show the heel bone was "angulated to one side" and the fractured part was pressing downward to form the sharp spur. Plaintiff argues that he will continue to suffer pain throughout his life and will be able to walk only with the aid of crutches because walking with a cane brings discomfort and swelling. Dr. Bennett testified that these abnormalities, both on the side and undersurfaces of the heel would smooth out with time. Dr. Turner said that plaintiff's condition was permanent; that the spurs might be removed by operation,

but with no certainty that they might not reform, and that it could not be said how future calcium deposits would develop. He said that these abnormalities caused pain in walking and would continue to do so, while Dr. Mitchell said that normal weight-bearing might avoid the principal source of irritation beneath the heel. Dr. Bennett said the joint between the ankle and the heel bones of plaintiff's right foot would probably be obliterated and the joint fixed so as to limit later motion. Dr. Mitchell's opinion was that there was two-thirds loss of motion in the foot. These issues of fact were for the jury upon the question of future pain and suffering.

At the time of the trial plaintiff had lost 4½ or 5 months' work, and Dr. Bennett estimated that he would be able to resume work as a Diesel engine fireman in about 8 months. Thus, defendant argues that, since plaintiff's salary was in the neighborhood of $250 per month, his maximum loss of earnings would proximate $3,000 and no more. Plaintiff's medical witnesses, after giving opinions that the damage to his right foot was permanent, testified that he would be unable to do the manual duties such as shoveling coal into the firebox, filling the tender with water and the normal work on a locomotive, as well as climbing on and off the engine and tender and standing on his feet shoveling coal. Defendant presented evidence to show that plaintiff was 57 or 58 on the seniority list of the railroad; that the firemen on Diesel engines had only to pass signals, watch movement around curves and that, outside of getting a jug of water, no other duties were necessary to supply the engine; and that no manual labor of any other kind was needed except to sweep out the cab of the locomotive. Dr. Bennett testified that plaintiff in 6 or 8 months from the time of the trial could carry on the duties of a fireman on a Diesel engine, consisting of those duties referred to. Defendant argues that there is no rebuttal to contro-

yert the testimony that plaintiff could resume his work as a fireman on a Diesel engine. The jury may have concluded that since the plaintiff's medical witnesses said plaintiff could not stand on his feet to shovel coal, he could not stand on them to sweep out the cab, and that he would have to climb in and out of the Diesel engine cab as well as out of a steam locomotive cab. Defendant cites several cases in which verdicts of much less size were approved, and in some, for injuries which were more severe. Suffice to say that in those cases the jury brought in the lesser verdicts. Plaintiff argues that the jury could reasonably compute the loss of future earnings by applying their common observation that plaintiff would live to be 70 years of age and have 19 years more employment. There was no actuarial evidence introduced. He likewise argues, and with support from *Avance v. Thompson*, 320 Ill. App. 406, that verdicts today should be considered in the light of increased living costs. He relies strongly upon *Taylor v. A. T. & S. F. Ry. Co.*, 292 Ill. App. 457, wherein there was a stipulation that the plaintiff was totally and permanently disabled from performing heavy manual labor such as is involved in the work of a railroad engineer or fireman. Plaintiff there was 49 years old, and as a result of his injuries his bowels and bladder had been paralyzed and blood and water had discharged from his ear; since the train collision which caused his injuries he had been in many hospitals and finally had to wear a neck brace, without which his head would fall over to the left; he could not dress, undress or shave, and his condition would grow gradually worse. The verdict in that case was reduced from $75,000 to $58,800 the latter part of 1937.

After a careful consideration of the instant case we are satisfied of defendant's liability, but we believe the verdict is excessive. It is our opinion that adequate compensation for the plaintiff is $22,500. Upon plaintiff filing a remittitur of $17,500 in this

court within ten days, the judgment will be affirmed, otherwise the judgment will be reversed and the cause remanded for a trial on the question of damages alone.

*Judgment affirmed on remittitur of $17,500, otherwise reversed and remanded on question of damages.*

BURKE, P. J., and LUPE, J., concur.